Craig A. Brandt (SBN 133905)
LAW OFFICE OF CRAIG A. BRANDT
5354 James Avenue
Oakland, CA 94618
Telephone: (510) 594-1356
Email: craigabrandt@att.net

Attorney for Plaintiff
EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC, a California limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>WESTAK INTERNATIONAL SALES, INC., dba WESTAK, INC., a California corporation; and LOUISE SOPHIA CRISHAM, an individual, DOES 1-10, inclusive,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION and DEMAND FOR JURY TRIAL**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§1251 et seq.)** |

Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") hereby brings this civil action pursuant to the Federal Water Pollution Control Act, also known as the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq*.

## INTRODUCTION

1. This action is a citizen suit for injunctive relief, declaratory relief, civil penalties, and remediation against Defendants for current and ongoing violations of the National Pollutant Discharge Elimination System ("NPDES") permit requirements of the CWA.

2. On or about May 20, 2025, EDEN provided a Notice of Defendants' violations of the CWA to the (1.) Administrator of the United States Environmental Protection Agency ("EPA"), (2.) EPA's Regional Administrator for Region Nine, (3.) Executive Director of the State Water Resources Control Board ("State Board") (4.) to Defendant WESTAK INTERNATIONAL SALES, INC., dba WESTAK, INC., ("WESTAK" or "Facility"), and (5.) a copy delivered to the CEO of Westak, Inc., Defendant LOUISE SOPHIA CRISHAM, each served by certified mail, at 1116 Elko Drive, Sunnyvale, California, as required by the CWA. 33 U.S.C. § 1365(b)(1)(A).

3. A copy of EDEN's 60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act"), is attached hereto as Exhibit A and incorporated herein by reference.

4. More than sixty days have elapsed since EDEN's Notice was properly and lawfully served on Defendants, the State Board, and the Regional and National EPA Administrators. EDEN is informed and believes, and thereupon alleges, that neither the National EPA, nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the CWA, 33 U.S.C. § 1319(g).

**JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT**

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief),

33 U.S.C. sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil penalties).

6. The Permit under which this case arises is a Federally required permit based upon California state substantive law. (*Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017), 853 F.3d 1076; *Dept. of Finance v. Commission on State Mandates,* 1 Cal.5th 749 (2016))

7. By its express language, a violation of the State permit constitutes a per se violation of the Federal Clean Water Act. (California's Industrial General Permit Order 2014-0057-DQQ amended by Order 2015-0122-DWQ & Order 2018-0028-DWQ, NPDES Order No. CAS000001, Section XXI.A)

8. Venue is proper because Defendants reside in and the events or omissions giving rise to EDEN's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper because the Facility's CWA violations have occurred and are occurring within the District. 33 U.S.C. § 1365(c)(1).

**PARTIES**

9. Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") is an environmental membership group organized under the laws of the State of California as a limited liability company on June 1, 2018. EDEN previously existed as an unincorporated environmental citizen's association, with members who remain associated with EDEN as of the date of the filing of this Complaint.

10. EDEN's organizational purpose is the protection, preservation and enhancement of California's waterways. Its mission is implemented by enforcing the provisions of the Federal Clean Water Act and California's Industrial General Permit by seeking redress from

environmental harms caused by Industrial Dischargers who pollute the Waters of the United States, through community education and citizen suit enforcement when necessary.

11. EDEN's members donate their time and money resources to protect, enhance, and assist in the preservation and restoration of rivers, creeks, streams, wetlands, vernal pools, and their tributaries located in California.

12. EDEN has members throughout California. Some of EDEN's members reside and work near the San Francisco Bay Estuaries, a tributary of the San Francisco Bay (the "Receiving Waters" for Defendant WESTAK's Facility storm water run-off), and use those waters and their watersheds for surfing, kayaking, camping, cycling, recreation, sports, fishing, swimming, hiking, photography, nature walks and scientific study. Their use and enjoyment of these natural resources have been and continue to be adversely impaired by Defendants' failure to comply with the procedural and substantive requirements of the California Industrial General Permit and Federal Clean Water Act.

13. EDEN has standing as an association to bring this suit against Defendants, as at least one of EDEN's current members is experiencing ongoing and continuing harm particular to him or her as a specific result of Defendants' violations of the CWA, and the resulting adverse effects to the environment and the Receiving Waters downstream from the Facility, and has experienced such harm since at least the date that EDEN provided to Defendants a 60-day Notice of Intent to Sue.

14. Specifically, the individual member(s) who are experiencing harm from Defendants' violations of the CWA are reluctant to utilize the Receiving Waters downstream from the Facility as specified in Paragraph 10, above, due to the pollution caused by Defendants' environmental violations that EDEN's members believe has entered into the Facility's Receiving

Waters; and the aesthetic and recreational interests of these members has been adversely impacted.

15. Defendants' ongoing violations of the General Permit and the CWA have and will continue to cause irreparable harm to EDEN and certain of its current members, for which they have no plain, speedy, or adequate remedy. The relief requested will redress the ongoing injury in fact to EDEN and its members. Litigation of the claims asserted and the relief requested in this Complaint will not require the participation in this lawsuit of individual members of EDEN.

16. EDEN is informed and believes, and on such information and belief alleges, that Defendant WESTAK, located at 1272, 1274, and 1276 Forgewood Avenue, in Sunnyvale, California, was formed on or about March 15, 1982 as a California corporation. On February 10, 2015, WESTAK submitted a Notice of Intent ("NOI") to be authorized to discharge storm water from the Facility and was assigned Waste Discharger Identification number ("WDID") 2 43I006896.

17. EDEN is informed and believes, and on such information and belief alleges that Defendant LOUISE SOPHIA CRISHAM is, and all relevant times was, the Chief Executive Officer ("CEO") for the Facility according to the documents on file the California Secretary of State.

18. EDEN is informed and believes, and on such information and belief alleges that Defendant LOUISE SOPHIA CRISHAM, as CEO for WESTAK, is legally responsible for ensuring all legal and regulatory requirements for the Facility are met, including but not limited to, verifying compliance with the CWA and the General Permit.

## STATUTORY BACKGROUND

19. Congress declared that the Federal Clean Water Act was designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through federal and state cooperation to develop and implement "programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters." 33 U.S.C. §§ 1251(a), 1252(a).

20. In order to accomplish this goal, Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342. *See also*, 40C.F.R. § 122.26(c)(1).

21. Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(p).

22. Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

<u>General Permit</u>

23. The State Board elected to issue a statewide general permit for industrial storm water discharges. The State Board originally issued the General Permit on November 19, 1991, and modified it on September 17, 1992. The State Board reissued the General Permit on April

17, 1997, and again on April 1, 2014. The 2015 Permit went into effect on July 1, 2015 and it maintained or made more stringent the same requirements as the 1997 Permit. The Permit was again amended on November 6, 2018 (the "Permit" or "General Permit"), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

24. In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit. 33 U.S.C. § 1311(a).

25. The General Permit contains several prohibitions. CWA § 301(a) prohibits the discharge of any pollutant to waters of the United States except in compliance with the Act, including permit limits issued under § 402. While § 301(b) requires control of conventional, nonconventional, and toxic pollutants through effluent limitations and related permit conditions. There are two principal bases for effluent limits: technology-based limits required by 40 C.F.R. § 122.44(a) and water-quality-based limits required by 40 C.F.R. § 122.44(d) to ensure attainment of numeric and narrative water quality criteria and protection of beneficial uses. *See also* 33 U.S.C. § 1311(b)(1)(C).

26. CWA § 301(b)(1)(A), 33 U.S.C. § 1311(b)(1)(A), prohibits the discharge of pollutants from point sources that exceed a level commensurate with the application of Best Practicable Control Technology ("BPT") currently available. The BPT standard applies to toxic, conventional, and non-conventional pollutants.

27. On information and belief, pollutants from WESTAK's operations are tracked on-site and off-site by vehicles, equipment, and foot traffic and are entrained in runoff that enters storm drains and other discrete conveyances connected to San Francisco Bay Estuaries, a

tributary of the San Francisco Bay (the "Receiving Waters"), further evidencing point-source discharges subject to Clean Water Act regulation.

28. CWA § 301 (b)(2)(A), 33 U.S.C. § 1311(b)(2)(A), prohibits the discharges from point sources that exceed a level commensurate with the application of Best Available Technology economically achievable ("BAT") for toxic and nonconventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15, and include chromium, nickel, copper, lead, and zinc, among others.

29. CWA § 301(b)(2)(E), 33 U.S.C. § 1311(b)(2)(E), prohibits the discharge of pollutants from point sources that exceed a level commensurate with the application of best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. A list of conventional pollutants is found in 40 C.F.R. § 401.16, and includes biochemical oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), and pH.

30. Pollutants from point sources exceeding effluent limitation is evidence WESTAK lacks sufficient BPT, BAT, and BCT-technology based pollutant control measures.

31. Effluent Limitation in Section V.A of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

32. Discharge Prohibition in Section III.C of the Permit prohibit storm water discharges that cause or threaten to cause an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

33. In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet. Facilities discharging, or having the potential to discharge, storm water associated with industrial activity which have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI"). Dischargers have been required to file NOIs since March 30, 1992.

34. Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards. The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-stormwater discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. General Permit, § X.C. These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

35. To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. General Permit, § X.B.

36. Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP as required, is a violation of the General Permit. General Permit, Fact Sheet §I (1).

37. Sections X.D – X.I of General Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a

list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges.

38. The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs. General Permit, § X.H.2. Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit.

39. The General Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table. General Permit, § X.H.4-5.

40. The General Permit requires dischargers to develop and implement an adequate written Monitoring and Reporting Program. The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.

41. As part of their monitoring program, Dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.

42. Section XI.B of the General Permit requires that Dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30), and that the samples be collected from all outfalls identified in the Facility SWPPP.

43. A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area. General Permit § XI.B.2.

44. Once the storm water samples have been collected, the General Permit requires that the Discharger deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H.2) and upload into SMARTS the resulting laboratory reports within 30 days from receipt of the report. General Permit § XI.B.11.

45. Facilities are also required to make monthly visual observations of storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event. General Permit, § XI.A.

46. The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. General Permit, § XV.

47. Under the General Permit, facilities must analyze storm water samples for pH, oil & grease and total suspended solids, as well as additional parameters indicated in the Permit by facility type and those parameters identified by the Discharger on a facility-specific basis that

serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment. General Permit, § XI.B.6.c.

48. The US EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.

49. The Numeric Action Levels ("NALs") in the General Permit are derived from these benchmarks. The Permit incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.

50. The following annual NALs have been established under the General Permit for pollution parameters applicable to the Facility: pH – less than 6.0 - 9.0 standard units ("S.U."); total suspended solids ("TSS") – 100 mg/L; oil & grease ("O&G") – 15 mg/L; iron – 1.0 mg/L, nitrate + nitrite nitrogen --.68 mg/L, zinc --.26 mg/L, phosphorus --2.0 mg/L, aluminum – .75 mg/L, lead – .262 mg/L, copper – .0332 mg/L, nickel – 1.02 mg/L and chemical oxygen demand – 120 mg/L. General Permit, Table 2.

51. An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30. An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH. General Permit § XII.A.

52. When a Discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs. Section XX,C.1.b of the General Permit requires the Discharger to conduct an evaluation with the assistance of a QISP by October of the following year to determine the industrial pollutant sources. Based upon the evaluation, the Discharger shall, as soon as practicable, but no later than January 1 following commencement of Level 1 status, revise the SWPPP and implement any additional BMPs identified in the evaluation. General Permit § XXI.C.2.

53. If a Discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status." General Permit §§ XII.D.

54. For Level 2 Status, a Discharger is required to submit an Action Plan and a Technical Report requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background. General Permit § XII.D.1-2. The Discharger shall certify and submit via SMARTS the Level 2 ERA Technical Report. General Permit § D.3.

55. Section XVI.A of the General Permit requires that all Dischargers must certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS.

56. Furthermore, Section XXI.L of the General Permit provides that all documents submitted to SMARTS, including SWPPPs and Annual Reports, be certified by a legally responsible party or duly authorized representative of the Facility, with the following certification:

"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified

personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

57. Section XXI.N of the General Permit provides that any person who knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under the General Permit, including reports of compliance or noncompliance shall upon conviction, be punished by a fine of not more than $10,000, or by imprisonment for not more than two years, or by both. *See* also Clean Water Act section 309(c)(4)

San Francisco Bay Regional Basin Plan

58. The Water Quality Control Board, San Francisco Bay Region has adopted the "San Francisco Bay Basin (Region 2) Water Quality Control Plan" ("Basin Plan"), as amended by Resolution No. R2-2010-0100, setting forth the Water Quality Standards ("WQS") and beneficial uses for San Francisco Bay and its tributaries.

59. The Beneficial Uses for San Francisco Bay are industrial service supply, shellfish harvesting, fish migration, preservation of rare and endangered species, fish spawning, commercial and sportfishing, estuarine habitat, wildlife habitat, recreational activities involving contact with water, recreational activities involving proximity to water, and navigation. *See* Basin Plan, Table 2-1.

60. Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plans are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

61. Polluted discharges from industrial sites, such as the Facility, contribute to the degradation of these already impaired surface waters and aquatic-dependent wildlife. Discharges of pollutants at levels above WQS contribute to the impairment of the Beneficial Uses of the waters receiving the discharges. WQS applicable to dischargers covered by the Storm Water Permit include, but are not limited to, those set out in the Basin Plan and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

62. The Basin Plan sets forth, among other things, narrative WQS for floating material, O&G, sediment, settleable matter, and suspended materials, and sets forth numeric WQS for pH, arsenic, cadmium, chromium VI, copper, cyanide, lead, mercury, nickel, selenium, silver, tributyltin, zinc, and PAHs. *See* Basin Plan §§ 3.3.6, 3.3.7, 3.3.9, 3.3.12-3.3.14, 3.3.21, and Table 3-3.

63. The Basin Plan also includes site specific objectives ("SSOs"), which are WQS for specific sites, for certain pollutants of concern, including copper and nickel. *See* Basin Plan, Table 3-3A. The CTR includes numeric criteria set to protect human health and the environment in the State of California.

64. Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQS are violations of Receiving Water Limitations in Section VI(A) of the General Permit.

<u>Citizen Suit Provision of the CWA</u>

65. Under the CWA, any citizen may commence a civil action against any person who is alleged to be in violation of an effluent standard or limitation under the CWA or an Order issued by a State with respect to such a standard or limitation." 33 U.S.C. §1365(a)(1). No action may be commenced prior to sixty days after the plaintiff has given notice of the alleged violation

(i) to the Administrator of the EPA, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order." 33 U.S.C. § 1365(b)(1)(A). By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

66. In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the district court's jurisdiction to apply any appropriate civil penalties under section 1319(d). 33 U.S.C. § 1365(a). Section 1319(d) declares that any person who violates any permit condition or limitation implementing any of such sections in an NPDES permit shall be subject to a civil penalty not to exceed $46,192 per day for each violation occurring before November 2, 2015, and $51,570.00 per day per violation for violations occurring after November 2, 2015. 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI.Q.1.

67. Violations of provisions of the General Permit, including those detailed below, constitute violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§ 19.1-19.4.

**FACTUAL ALLEGATIONS WHICH GIVE RISE TO CLAIMS**

68. Defendant WESTAK is an establishment primarily engaged in manufacturing printed circuit boards. EDEN is informed and believes that the Facility falls under standard industrial classification ("SIC") code 3672 – Printed Circuit Boards.

69. EDEN is informed and believes that WESTAK stores industrial materials outdoors that can be exposed to storm water, eroded by wind, and otherwise contaminate the surrounding watershed.

70. Based on EDEN's investigation, including a review of the Facility's Notice of Intent to Comply with the Terms of the Industrial General Permit ("NOI"), SWPPP, aerial photography, and EDEN's information and belief, storm water is collected and discharged from the Facility through a series of channels that discharge via at least one outfall. The outfall discharges storm water and pollutants contained in that storm water directly into the municipal storm drain system ("MS4"), which then discharges to the Saratoga Creek-Frontal San Francisco Bay Estuaries, a tributary of the San Francisco Bay ("Receiving Waters"), a navigable Water of the United States.

71. Plaintiff is informed and believes, and thereupon alleges that the storm water flows over the surface of the Facility where industrial activities occur and areas where airborne materials associated with the industrial processes at the facility may settle onto the ground. Plaintiff is informed and believes pollutants from WESTAK's operations are tracked on-site and off-site by vehicles, equipment, and foot traffic. Plaintiff is informed and believes, and thereupon alleges that storm water flowing over these areas collects suspended sediment, dirt, metals, and other pollutants as it flows towards the storm water channels.

72. On information and belief, Plaintiff alleges that there are insufficient structural storm water control measures installed at the Facility. Plaintiff is informed and believes, and thereupon alleges, that the management practices and oversight by WESTAK and WESTAK's CEO Defendant LOUISE SOPHIA CRISHAM at the Facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.

Deficient SWPPP and Site Map

73. On information and belief, Plaintiff alleges that since at least February 10, 2015, Defendants have failed to develop and implement an adequate SWPPP for the Facility and have failed to correct the site map for the Facility so as to conform with the requirements outlined in the General Permit. *See* 60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act"), attached hereto as Exhibit A, pp. 4-8, and incorporated herein by reference.

74. Plaintiff is informed and believes, and thereupon alleges, that the Facility's SWPPP does not set forth site-specific Best Management Practices (BMPs) for the Facility that are consistent with BAT or BCT for the Facility.

75. Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not comply with the requirements of Sections X.G.1.e, X.G.2, and X.H of the General Permit.

76. According to information available to EDEN, Defendants' SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to further reduce pollutant discharges. Plaintiff is informed and believes, and thereupon alleges, that the SWPPP does not include each of the mandatory elements required by the General Permit.

77. Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent with the General Permit.

78. Furthermore, Defendants have failed to upload an amended SWPPP to incorporate additional BMPs recommended by its SWPPP in the Facility's Level 1 ERA Report

or Level 2 Action Plan dated June 23, 2025, in violation of Section XII.C.2 of the General Permit.

79. In addition, Plaintiff alleges that Defendants have failed to comply with the provisions of its current SWPPP in the areas of monitoring and reporting.

80. Information available to EDEN indicates that as a result of the Defendants' practices, storm water containing excessive pollutants is being discharged during rain events into the MS4 which eventually flows into the San Francisco Bay, including the pollutants of pH, Total Suspended Solids (TSS), Oil & Grease (O&G), Nickel (Ni) Copper (Cu).

81. Furthermore, printed circuit boards include a number of hazardous heavy metals, including, Tin (Sn), Lead (Pb), Zinc (Zn), Nickel (Ni), Iron (Fe), Magnesium (Mg), and as a result of Defendants' actions, these heavy metals are being discharged into the MS4 which flows eventually into the San Francisco Bay. Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to conduct a sufficient Pollution Source Assessment taking into account the above-referenced heavy metals to determine whether they had the potential to come into contact with storm water pursuant to Sections X.G of the General Permit.

82. Information available to Plaintiff indicates that Defendants have not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water. Plaintiff is informed and believes, and thereupon alleges, that all the violations alleged in this Complaint are ongoing and continuing.

Monitoring and Reporting

83. On information and belief, EDEN alleges that Defendants have an inadequate monitoring program at its Facility.

84. On information and belief, EDEN alleges that during the 2019-2020 reporting year, Defendants failed to collect and analyze one storm water sample from the first half of the reporting year and one storm water sample from the second half of the reporting year.

85. On information and belief, EDEN alleges that during the 2020-2021 reporting year, Defendants failed to collect and analyze one storm water samples from the first half of the reporting year and two storm water samples from the second half of the reporting year.

86. On information and belief, EDEN alleges that during the 2021-2022 reporting year, Defendants failed to collect and analyze two storm water samples from the second half of the reporting year.

87. On information and belief, EDEN alleges that during the 2023-2024 reporting year to date, Defendants failed to collect and analyze one storm water sample at its Facility.

88. On information and belief, EDEN alleges that Defendants have failed to conduct monthly visual observations of storm water discharges at the Facility since at least February 10, 2015.

89. On information and belief, EDEN alleges that Defendants have taken several samples of storm water discharges at the Facility that failed to comply with the General Permit's requirement that samples be during a Qualified Storm Events ("QSE") preceded by a period without a discharge. *See* 60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act"), attached hereto as Exhibit A, pp. 10-11, and incorporated herein by reference.

90. On information and belief, EDEN alleges that Defendants have failed to collect storm water samples from each drainage area at all discharge locations for each QSE where sampling is performed, pursuant to General Permit § XI.B. Pursuant to WESTAK's SWPPP for

its Facility, it has several sampling locations. Not all of the samples it collected contained sampling for all discharge locations.

91. On information and belief, EDEN alleges that Defendants have failed to deliver the Facility storm water samples to a qualified Laboratory within 48 hours of collection, pursuant to Attachment H, Section 2 of the General Permit. *See* 60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act"), attached hereto as Exhibit A, p. 12, and incorporated herein by reference.

92. EDEN is informed and believes that Defendants have failed to upload Facility storm water sample analyses within 30 days of obtaining the result for the sampling event, in violation of Section XI.B.11 of the General Permit. *See* 60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act"), attached hereto as Exhibit A, pp. 14-16, and incorporated herein by reference.

93. EDEN is informed and believes that Defendants have failed to correctly sample for the parameter pH. The laboratory reports show evidence that the litmus test for the Facility's pH was not conducted within the required 15-minute holding time pursuant to Section XI.C.2.a of the General Permit.

<u>Failure to Comply with Required Exceedance Response Actions</u>

94. EDEN is informed and believes that the Facility exceeded the Annual NAL for copper for the reporting year 2015 – 2016, which placed WESTAK in Level 1 status on July 1, 2016. EDEN is informed and believes that WEST has failed to conduct an evaluation and to complete a Level 1 Exceedance Response Action report ("ERA") for copper, a violation of Section XII.C of the General Parmit.

95. EDEN is informed and believe that the Facility subsequently entered into Level 2 status for copper on July 17, 2017, pursuant to Section XII.D of the General Permit. EDEN is informed and believe that while the Facility was in Level 2 status for copper, WESTAK again exceeded the NAL values for copper for every reporting period from 2017 – 2018 through 2025 – 2025, which are multiple violations of the General Permit. *See* 60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act"), attached hereto as Exhibit A, p. 24, and incorporated herein by reference.

96. EDEN is informed and believes that the Facility entered into Level 1 status for ph. on July 1, 2024. EDEN is informed and believes that WESTAK has failed to conduct an evaluation and to upload and a Level 1 ERA for pH, which is a violation of the General Permit.

<u>Failure to Implement BAT/BCT and BMPs</u>

97. EDEN is informed and believes that WESTAK has failed to identify and implement Best Management Practices ("BMPs") at its Facility that comply with the requirements of the General Permit for best conventional treatment (BCT) for conventional pollutants, and best available technology (BAT) for toxic and non-conventional pollutants. These technology-based pollution controls are required to be implemented in a manner that reflects best industry practice considering technological availability and economic practicability and achievability. General Permit §§ I.C, V.A.

98. Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the Saratoga Creek-Frontal San Francisco Bay Estuaries, a tributary of the San Francisco Bay ("Receiving Waters"), a navigable Water of the United States.

Discharges of Contaminated Storm Water

99. Since commencement of Facility operations, Defendants have failed to collect and analyze all the storm water samples required for the Facility.

100. Information available to EDEN indicates that storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges.

101. Due to the nature of the operations at the Facility, coupled with the documented lack of proper BMP implementation and contaminated storm water discharges, Defendants are discharging storm water containing excessive levels of pollutants specific to their operation during at least every significant local rain event. These pollutants include, among other things, Copper, Nickel, and pH.

Failure to Train Employees

102. The General Permit require all Facilities to designate a Legally Responsible Person to implement the requirements of the Permit, who is then responsible for appointing a Pollution Prevention Team and ensuring that the Team is properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.

103. Defendants have failed to implement adequate BMPs at the Facility, have not conducted monthly visual observations, and have failed to comply with required storm water sampling and analysis.

104. Further evidence of the Facility's failure to train its employees is evidenced by, among other things, failing to properly collect pH samples, failing to manually upload storm

water testing data, failing to prepare Level 1 and Level 2 ERAs, and failing to conduct an adequate Pollution Source Assessment for the Facility.

**FIRST CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan and Site Map**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

105. Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

106. The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP and Site Map for the Facility.

107. As outlined herein, Defendants have failed to develop and implement an adequate SWPPP and Site Map for the Facility.

108. Each day since February 10, 2015, that Defendants failed to develop, implement and update an adequate SWPPP and Site Map for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

**SECOND CAUSE OF ACTION**
**Failure to Develop and Implement an**
**Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

109. Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

110. The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including sampling and analysis of discharges) that complies with the terms of the General Permit.

111. As outlined herein, Defendants have failed to develop and implement an adequate monitoring and reporting program for its Facility.

112. Each day since at least February 10, 2015, that Defendants have failed to develop and implement an adequate monitoring and reporting program for its Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants. The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

113. Noncompliance with the General Permit constitutes a violation of the CWA against all Defendants. General Permit § XXI.A; 33 U.S.C. § 1342.

**THIRD CAUSE OF ACTION**
**Failure to Implement the Best Available and**
**Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

114. Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

115. The General Permit's SWPPP requirements and Effluent Limitation V.A of the General Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

116. Defendants failed to implement BAT and BCT at the Facility for its discharges of including the pollutants of pH, Total Suspended Solids (TSS), Oil & Grease (O&G), Nickel (Ni) Copper (Cu), as well as, a number of heavy metals used in print circuit boards including, Tin (Sn), Lead (Pb), Zinc (Zn), Nickel (Ni), Iron (Fe), Magnesium (Mg, and other potentially un-monitored pollutants, in violation of Effluent Limitation V.A of the General Permit.

117. Each day since at least February 10, 2015, that Defendants have failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct

violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

**FOURTH CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

118. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

119. Discharge Prohibition III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance. Receiving Water VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI.A and Discharge Prohibition III.D of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

120. Plaintiff is informed and believes, and thereupon alleges, that since at least February 10, 2015 Defendant WESTAK has been discharging polluted storm water from the Facility, in excess of applicable water quality standards in violation of Receiving Water Limitation VI.A and Discharge Prohibition III.D of the General Permit.

121. During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at both facilities, becoming contaminated with heavy metals and other potentially un-monitored pollutants at levels above applicable water quality standards. The storm water then flows untreated directly into the municipal storm drain system

("MS4"), which then discharges to the Saratoga Creek-Frontal San Francisco Bay Estuaries, a tributary of the San Francisco Bay ("Receiving Waters"), a navigable Water of the United States.

122. Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitations of the General Permit.

123. Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations of the General Permit.

124. Every day since at least February 10, 2015, that Defendant WESTAK has discharged and continues to discharge polluted storm water from its Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants. These violations are ongoing and continuous.

**FIFTH CAUSE OF ACTION**
**Failure to Comply with Required Exceedance Response Actions**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

125. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

126. The General Permit requires that all Dischargers who enter Level 1 or Level 2 status comply with specific Exceedance Response Actions delineated in Section XII of the General Permit.

127. As herein alleged, WESTAK has failed to date to comply with the Exceedance Response Actions provisions for copper and pH, as required of it by the General Permit.

128. Each day that Defendants have failed to comply with the Exceedance Response Actions required by the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

**SIXTH CAUSE OF ACTION**
**Failure to Properly Train Facility Employees and Pollution Prevention Team**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

129. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

130. Section X.D.1 of the General Permit requires each Facility to establish a Pollution Prevention Team who is then responsible for assisting with the implementation of the requirements of the General Permit. The Facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

131. Section X.H.f of the General Permit also requires that each facility ensure that all of its Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities. Further, if a Facility enters Level 1 status, appropriate team members must be trained by a QISP.

132. Since at least February 10, 205, Defendants have failed to properly train Facility employees and the designated members of its Pollution Prevention Team, which has resulted in the General Permit violations alleged herein.

**SEVENTH CAUSE OF ACTION**
**(Recovery Under the Catalyst Theory CCP §1021.5)**

133. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

134. Under the substantive law of California, if a plaintiff is a catalyst in encouraging a Defendant to voluntarily comply with its legal obligations, the plaintiff may recover its fees and costs. *Graham v. DaimlerChrysler Corp*., 101 P.3d 140, 21 Cal. Rptr. 3d 331, 34 Cal. 4th 553 (2004), *Tipton-Wittingham v. City of Los Angeles* (Cal.Dec. 2, 2004), 34 Cal.4th 604, 21 Cal.Rptr.3d 371, 101 P.3d. 174, 2004 Cal. LEXIS 11335.

135. A requirement for recovery under the catalyst theory is that a plaintiff first advise the Defendant of the claim and provide an opportunity to resolve the matter. The Plaintiff in this case complied by providing both the catalyst and the written notice of the claim to Defendants prior to suit.

136. In the event Defendants allege the claims are moot or are non-justiciable, then Plaintiff must be awarded its fees and costs under California Code of Civil Procedure Section 1021.5 ("Catalyst Theory").

137. Since the substantive law of California governs awards of Catalyst Theory fees (as opposed to Federal law), Plaintiff requests the Court exercise supplemental jurisdiction over any award of Catalyst Theory fees.

//

//

//

//

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1. Declare Defendants to have violated and to be in violation of the CWA;

2. Issue an injunction ordering Defendants to immediately operate the Facility in compliance with the NPDES permitting requirements contained in the General Permit and the CWA;

3. Enjoin Defendants from discharging pollutants from Defendant WESTAK's Facility to the surface waters surrounding the Facility until such time as WESTAK has developed and implemented an adequate SWPPP, compliant Site Map and implemented appropriate BMPs;

4. Order Defendants to pay civil penalties of $66,712 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

5. Order Defendants to pay to the United States a civil penalty of not less than $5,000 per year for a minimum of five years for noncompliance pursuant to California Water Code §§ 13399.30 and 13399.03;

5. Order Defendants to take appropriate actions to restore the quality of United States waters impaired by its activities at WESTAK's Facility;

6. Order Defendants to pay EDEN's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law;

7. Award Plaintiff additional attorney fees under California Code of Civil Procedure §1021.5, to the extent that Plaintiff's Notice of Intent to Sue directed to Defendants was the catalyst for Defendants' voluntary corrective action or cessation of the violations included in

Plaintiff's Notice, provided that Defendants undertook any such corrective action after receiving Plaintiff's Notice, and;

8. Award such other and further relief as may be just and proper.

**JURY DEMAND**

The Plaintiff hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: November 16, 2025

Respectfully,

By: __*/s/_Craig A. Brandt*___________
Craig A. Brandt
Attorney for Plaintiff